IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Patricia Ann Barnes,                )
                                    )    Civil Action No. 6:15-1778-HMH-KFM
                    Plaintiff,      )
                                    )    **REPORT OF MAGISTRATE JUDGE**
          vs.                       )
                                    )
Verizon Wireless Corporation,       )
                                    )
                    Defendant.      )
_____     )

      This matter is before the court on the defendant's motion for summary judgment.  The plaintiff, who is proceeding *pro se*, alleges that the defendant discriminated against her because of her disability.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(e) (D.S.C.), all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

      On January 19, 2016, the defendant filed a motion for summary judgment (doc. 45).  On January 20, 2016, this court filed an order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) advising the plaintiff of the summary judgment procedure and directing her to file a response by February 25, 2016.  After being granted one extension of time, the plaintiff filed her response on March 28, 2016 (doc. 55).  On April 7, 2016, the defendant filed a reply (doc. 57).

## FACTS PRESENTED

      The defendant is the country's largest wireless service provider and operates three "call centers" in South Carolina, where customer service calls regarding products and services, billing issues, equipment, and any other issue related to the customer's account are received and resolved (doc. 45-8, Bryson aff. ¶ 2).

      In 1997, the plaintiff was hired as a Customer Service Representative ("CSR") at the Bell Atlantic Mobile Call Center in Greenville, South Carolina (doc. 55-1, pl. aff. ¶ 2).

Bell Atlantic later merged with the defendant, and the plaintiff became an employee of the defendant (doc. 45-2, pl. dep. 23).  As a CSR, the plaintiff was responsible for handling incoming calls from customers, listening to their questions or concerns regarding services, billing, or other issues, and advising them on the defendant's products and services (*id.* at 25).  In April 2000, she was promoted to Customer Service Trainer at the defendant's Greenville Call Center (doc. 55-1, pl. aff. ¶ 2).  The plaintiff's title later changed to Senior Trainer, a position she would hold throughout the remainder of her employment with the defendant (doc. 45-2, pl. dep. 25-26).  As a Senior Trainer, the plaintiff was part of the team responsible for teaching CSRs how to successfully perform their jobs (*id.* at 26).

The defendant's customer support personnel are the primary link between the company and its customers (doc. 45-8, Bryson aff. ¶ 5).  In the highly competitive wireless industry, providing quality customer service is essential (*id.* ¶ 4).  As a result, the defendant takes training very seriously, expending valuable time and resources to ensure that its customer service personnel are well-trained (*id.* ¶¶ 4-5; doc. 45-2, pl. dep. 31-32).

During her employment, the plaintiff and other Training Department personnel were responsible for training CSRs (doc. 45-2, pl. dep. 26).  The CSR position is the defendant's entry-level customer service position (*id.* at 28).  Most new CSRs have no background in the wireless industry or knowledge of the defendant's policies, products, or services beyond a consumer level (*id.*).  Accordingly, training newly-hired CSRs is a primary responsibility of the Training Department (doc. 45-7, pl. resp. to RFA ¶ 3; doc. 45-8, Bryson aff. ¶ 5).  Another primary responsibility of the Training Department is facilitating training classes for existing CSRs, called "recurrent" or "embedded" training (doc. 55-16, Evans dep. 7-8; doc. 55-14, Bullock dep. 7-8).

The defendant's training program for newly-hired CSRs begins with seven weeks of intensive classroom instruction, where new CSRs are trained on the company's equipment, its policies and procedures, and its "core values" with respect to customer service (the "New Hire Class") (doc. 45-2, pl. dep. 30-31).  As a Senior Trainer, the plaintiff was part of the team responsible for teaching the New Hire Class and coordinating the

2

12-week "transition" period as CSRs begin to take on their full duties (*id.* at 28-30). The plaintiff's performance was evaluated based on her ability to effectively communicate the defendant's policies, procedures, equipment, services, and other facets of the customer service position to new CSRs (*id.* at 34-35).

For nearly 13 years, the plaintiff was one of approximately six to ten Senior Trainers at the Greenville Call Center (*id.* at 142). During the time period relevant to this case, the plaintiff was supervised by Tracie Shields, Supervisor: Learning and Development. The Training Department was managed at a regional level by Associate Director Jennifer Fischley, who was based in Alpharetta, Georgia, but periodically traveled to Greenville for training initiatives (*id.* at 35-36, 101).

In May 2012, the plaintiff went on a medical leave of absence for a planned surgical procedure (*id.* at 37). While on medical leave, the plaintiff experienced an unrelated medical emergency, which was ultimately diagnosed as a vascular disease causing a blood clot in the plaintiff's leg (*id.* at 38-40). The plaintiff experienced complications from surgery intended to treat the condition, requiring several additional months of recovery (*id.* at 40). Metlife[1] initially placed the plaintiff on short-term disability status, but, in November 2012, the plaintiff obtained long-term disability status based on her continued inability to work (*id.*).

In December 2012, the plaintiff's condition began to improve, and she consulted her physician, Dr. Steven Chastain, about potentially returning to work (*id.* at 49-50). Dr. Chastain recommended that the plaintiff return to work on a "trial" basis in January 2013, starting with two weeks of part-time work (*see* doc. 45-3, pl. dep., ex. 5). Pursuant to the defendant's policy, the plaintiff and Dr. Chastain submitted several Work Place Arrangement ("WPA") forms, requesting that the plaintiff be granted several accommodations upon her return to work, including two weeks of part-time duty, limited walking, frequent rest breaks, and a footstool to elevate her legs (*id.* at 49-50, 54-58). The

---

[1] The defendant's long-term disability plans are administered and insured by Metlife.

defendant granted the accommodations the plaintiff and her physician requested in the WPA forms (*id*. at 61-62).

The plaintiff admits that neither she nor her physician requested at that time an accommodation for any cognitive or short-term memory issue associated with her condition, because the plaintiff did not have any such issue at that time (doc. 45-7, pl. resp. to RFA ¶¶ 9-13; doc. 45-2, pl. dep. 59-61). On January 15, 2013, the plaintiff returned to work on a temporary part-time basis, as recommended by her physician (doc. 45-2, pl. dep. 61-62). The plaintiff returned to full-time work on January 29, 2013 (doc. 55-1, pl. aff. ¶ 8).

Because the plaintiff had been on leave from the organization for more than eight months, the plaintiff's management team did not require the plaintiff to immediately begin teaching the New Hire Class or otherwise assume the ordinary duties of a Senior Trainer (doc. 45-2, pl. dep. 64). Instead, the defendant provided the plaintiff with several months of re-training time in an effort to assist her in her return to work, including opportunities to observe other Senior Trainers teach the New Hire Class, shadow new CSRs during the transition period, take incoming calls with customers, and complete various online training modules (*id.* at 64-67). The plaintiff was also given the opportunity to develop and present short "recurrent" training modules to current CSRs (*id.* at 63).

Throughout this time period, the plaintiff never suggested to anyone with the defendant that she was having trouble transitioning back to work or that she needed assistance in any way (doc. 45-7, pl. resp. to RFA ¶ 17; doc. 45-9, Shields aff. ¶ 9). The plaintiff consistently indicated that she was doing fine and had no concerns regarding her progress (doc. 45-9, Shields aff. ¶ 9).

In late 2012, prior to the plaintiff's return to work, the defendant formally adopted a new training curriculum company-wide for its New Hire Class (doc. 45-2, pl. dep. 65). The content of the class was largely the same as in previous years, but trainers were expected to employ a new method called the "Experiential Facilitation Technique" ("EFT") to teach newly-hired CSRs (doc. 45-9, Shields aff. ¶ 6; doc. 45-2, pl. dep. 79). Similar to the "Socratic method," the EFT method was designed to prioritize thought-provoking

4

questions and discussion among CSR participants over traditional trainer-led lectures (doc. 45-4, Shields dep. 11-12).

On April 2, 2013, the plaintiff and four other Senior Trainers received details regarding the defendant's Customer Service New Hire Certification Program (the "Certification Program") (*see* doc. 45-3, pl. dep., ex. 6).  The Certification Program included several phases, beginning with several weeks of written "pre-work" assignments, study time, and a series of related conference calls (doc. 45-2, pl. dep. 74-75).  The program culminated in a two-day "face-to-face" certification workshop, in which trainers were required to demonstrate mastery in delivering the EFT method through "teach-backs" (*id.* at 94-95).  The defendant required the plaintiff and all other trainers to successfully complete the Certification Program in order to be certified to teach the New Hire Class (doc. 45-7, pl. resp. to RFA ¶ 18; doc. 45-2, pl. dep. 71-72).  The defendant provided the plaintiff and other trainers with a written "Trainer Readiness Criteria" policy, which set forth the company's expectations for successful completion of the Certification Program (*see* doc. 45-2, pl. dep. 83-84; *see also* doc. 45-3, pl. dep., ex. 8).  The policy identified specific criteria required for trainers to demonstrate competency in the redesigned New Hire Class curriculum, including, among other things, completion of all "pre-work," demonstrating preparation skills, demonstrating mastery of delivering content through EFT techniques, and appropriate usage of electronic tablets for content delivery (doc. 45-3, pl. dep., ex. 8).  In her deposition, the plaintiff admitted that the Trainer Readiness Policy accurately identified the defendant's expectations and requirements for trainers to be certified to teach new hires (doc. 45-2, pl. dep. 85).

The Trainer Readiness Criteria policy indicated that trainers would be classified as either "ready" or "not ready" to teach the New Hire Class, depending on their satisfaction of the various criteria of the Certification Program.  Trainers who successfully satisfied all the criteria would be deemed "ready" to teach the New Hire Class, while any trainer who did not demonstrate all required competencies would be deemed "not ready" and would be required to work with their supervisors to prepare a development plan until

the trainer was "ready" to teach new hires (doc. 45-2, pl. dep. 85-87; *see also* doc. 45-3, pl. dep., ex. 8).

On April 17-18, 2013, the plaintiff participated in the certification workshop at the Greenville Call Center, along with four other trainers in the defendant's Southeast Region (doc. 45-2, pl. dep. 93-94).  On the second day of the workshop, the plaintiff was required to perform a short teach-back of New Hire Class content using the EFT method (*id*. at 94-95).

Teach-backs were a common training tool for the defendant and was familiar to the plaintiff and other Training Department employees (doc. 45-5, Bullock dep. 9; doc. 45-6, Evans dep. 9-10; doc. 45-4, Shields dep. 21).  Teach-backs required the trainer to successfully prepare and teach a 20-minute training module to supervisors and peers after being taught the same material by the lead trainer (doc. 45-2, pl. dep.  95-96).  After the teach-back, the trainer would be provided with immediate feedback from supervisors and peers regarding his or her performance (*id*.)

The plaintiff did not perform well during the April 18, 2013, teach-back (doc. 45-9, Shields aff. ¶ 12; doc. 55-1, pl. aff. ¶ 11).  The plaintiff stated in her deposition that she "would start out and then all of a sudden it was as if I never looked at the material" (doc. 45-2, pl. dep. 96-97, 102).  After the workshop, the plaintiff met privately with Ms. Shields and Ms. Fischley to discuss her performance during the teach-back and review written feedback from her peers (doc. 45-2, pl. dep. 101).   The plaintiff acknowledged her difficulties organizing the content and presenting the information in a logical manner (*id.* at 102; doc. 45-9, Shields aff. ¶ 13).

In their meeting after the workshop, Ms. Shields advised the plaintiff that she was being considered "not ready" to teach the New Hire Class based on her teach-back performance at the workshop (doc. 45-2, pl. dep. 101-102).  The plaintiff admits that her teach-back performance warranted "not ready" status and that the defendant reasonably expected her to be able to successfully complete a teach-back before training new hires (*id.* at 102-105).

6

Consistent with the defendant's Trainer Readiness Criteria policy, Ms. Shields advised the plaintiff in the April 18, 2013, meeting that she could continue studying, observing other trainers, and practicing teach-backs until she successfully satisfied the criteria required to teach the New Hire Class (doc. 45-9, Shields aff. ¶ 13; doc. 45-6, Evans dep. 17-19; doc. 45-2, pl. dep. 82, 105-106; *see also* doc. 45-3, pl. dep., ex. 8). Over the following weeks, the plaintiff worked with Ms. Shields to prepare a "development plan" or "performance improvement plan" with a schedule of tasks designed to assist the plaintiff in completing the certification (doc. 45-2, pl. dep. 109-110; doc. 45-4, Shields dep. 37; doc. 45-3, pl. dep. ex. 11-12; doc. 55-15). The plan identified additional training that was assigned to help the plaintiff reach "ready" status, including, among other things, one-on-one instruction on operating the electronic tablet, various "skill drills" and baseline training exercises, and a schedule of teach-backs on the various content modules included within the New Hire Class (doc. 45-4, Shields dep. 24-25; doc. 45-2, pl. dep. 110-112, 120-23; *see also* doc. 45-3, pl. dep., ex. 11-12). The plaintiff's primary responsibility during this time period was to study and practice teach-backs so that she could complete the Certification Program (doc. 45-2, pl. dep. 122-23).

On May 2, 2013, the plaintiff met with her physician and explained that in mid April she had begun to experience bouts of confusion, forgetfulness, and some slurring (doc. 55-1, pl. aff. ¶ 12). The plaintiff's doctor felt that the combination of Neurontin and Lortab could be causing the plaintiff's issues and cut back the dosage to wean the plaintiff off the medicines so that they could be replaced with Nucynta (*id.*).

On or about May 10, 2013, the plaintiff was to teach a short training module of her choice during a New Hire Class, with the hope that the plaintiff would demonstrate improvement after three weeks of additional practice (doc. 45-2, pl. dep. 106-07; doc. 45-9, Shields aff. ¶ 14). The plaintiff had the same issues as in the April teach-back when she again "drew the blank" (doc. 45-2, pl. dep. 107; *see* doc. 55-1, pl. aff. ¶ 13). According to Ms. Shields, the plaintiff demonstrated the same deficiencies in effectively organizing and

7

communicating content as in her teach-back the previous month (doc. 45-9, Shields aff. ¶ 14).

After teaching the May 10 training module, the plaintiff met with Ms. Shields and Ms. Fischley to discuss her performance[2] (doc. 45-2, pl. dep. 106-08).  The plaintiff acknowledged that she performed poorly and told Ms. Shields and Ms. Fischley that her physician believed she may be experiencing mild cognitive issues from the pain medication she had been prescribed in 2012 during her surgery recovery (*id.* at 132-37; doc. 45-9, Shields aff. ¶ 16).  The plaintiff told them that she had stopped taking the medication and that her physicians had advised that any cognitive issues she experienced should subside once the medication left her system (*see* doc. 1 at 3, comp.; doc. 45-2, pl. dep. 135-37).  According to the plaintiff's testimony, Ms. Fischley responded that "it wasn't good enough" (doc. 45-2, pl. dep. 137, 141-42).  In her affidavit, the plaintiff states that she asked in this meeting whether she could "do other duties until the medications are under control" (doc. 55-1, pl. aff. ¶ 13).  She states that Ms. Fischley responded, "No.  That is not good enough. I have a business to run" (*id.*).  The plaintiff provided no information to Ms. Shields and Ms. Fischley regarding her medications other than to inform them that any medication-related memory issues that may have been impacting her performance should subside since she had stopped taking the medication (doc. 45-2, pl. dep. 135-41; doc. 45-9, Shields aff. ¶ 16).

After the meeting on or about May 10, 2013, the plaintiff did not raise the issue of potential cognitive issues related to her medications or request an accommodation of any kind to any employee of the defendant throughout the remainder of her employment (doc. 45-2, pl. dep. 143-44; doc. 45-9, Shields aff. ¶ 16).  The plaintiff consistently reiterated in each meeting with her management team that she was capable of performing her job and

---

[2]  In her complaint, the plaintiff alleged that this meeting occurred on May 22, 2013, a date on which the plaintiff was away from work on a personal vacation (doc. 1 at 3, comp.; doc. 45-2, pl. dep. 148-49).  In her deposition, the plaintiff clarified that she believed this meeting occurred on or about May 10, 2013 (doc. 45-2, pl. dep. 106-08). There is no dispute that this meeting was the only time the plaintiff mentioned her medications as the cause of her performance issues.

did not need any additional assistance (doc. 45-7, pl. resp. to RFA ¶ 17; doc. 45-2, pl. dep. 141-42, 155-59; doc. 45-9, Shields aff. ¶¶ 15-16; doc. 45-8, Bryson aff. ¶ 10).

The plaintiff's development plan was scheduled to culminate with a series of four teach-backs from May 31 through June 5, 2013,[3] each covering a specific training module for the New Hire Class (doc. 45-2, pl. dep. 113-14, 120-22; *see also* doc. 45-3, pl. dep., ex. 12).  The plaintiff continued to perform poorly during teach-backs (doc. 45-2, pl. dep. 166-67; doc. 45-7, pl. resp. to RFA ¶¶ 22-24).  The defendant continued to provide the plaintiff with immediate feedback and suggestions for improvement after each unsuccessful teach-back in an effort to help her improve (doc. 45-7, pl. resp. to RFA ¶ 23).  Because the plaintiff's performance was not improving, Ms. Shields engaged Human Resources Business Partner Deborah Bryson to participate in the plaintiff's teach-backs and development meetings and to offer advice on the plaintiff's progress (doc. 45-9, Shields aff. ¶ 14; doc. 45-8, Bryson aff. ¶ 9).

On June 5, 2013, after the plaintiff unsuccessfully performed another scheduled teach-back, the plaintiff met with Ms. Shields and Ms. Bryson to update her development plan and discuss what additional resources the defendant could provide to assist her (doc. 45-9, Shields aff. ¶ 17; doc. 45-8, Bryson aff. ¶ 11; doc. 45-2, pl. dep. 151-53).  After the June 5 meeting, Ms. Shields sent the plaintiff an email recap of their earlier discussion and scheduled a series of 12 teach-backs throughout the month of June, with the goal of providing the plaintiff with as much practice as possible to demonstrate proficiency in the new method (*see* doc. 45-3, pl. dep., ex. 13).  The email further stated that if the plaintiff demonstrated a strong knowledge of the content and was able to transfer that knowledge through EFT skills in her next teach-back, she would be allowed to teach the same module to the New Hire Class (*id.*).  The email also provided the plaintiff with detailed advice for increasing her comfort level with the EFT curriculum and reiterated the defendant's criteria for teaching a successful training module (*id.*)

---

[3]  The plaintiff was on vacation from May 15 to May 27, 2013 (doc. 55-1, pl. aff. ¶ 15).

On or about June 10, 2013, the plaintiff performed the first teach-back in the series (doc. 45-2, pl. dep. 163-64). The plaintiff performed poorly, and afterwards she met with Ms. Bryson[4] for feedback on her progress (id.). Ms. Bryson reminded the plaintiff of the detailed teach-back schedule for the month of June and discussed the importance of showing improvement in the upcoming series of teach-backs (id. at. 161-62; doc. 45-8, Bryson aff. ¶ 12). At that point, the plaintiff asked Ms. Bryson what other options were available if she could not complete the teach-backs, which was the first time that the plaintiff suggested she did not feel capable of improving (doc. 45-2, pl. dep. 171-72; doc. 45-8, Bryson aff. ¶ 12; doc. 45-9, Shields aff. ¶ 18). Ms. Bryson suggested that the plaintiff could consider other employment opportunities with the defendant, such as a CSR position, or, alternatively, she could explore retirement options (doc. 45-2, pl. dep. 169-72; doc. 45-8, Bryson aff. ¶ 12; doc. 45-9, Shields aff. ¶ 18). The plaintiff asked several questions about retirement eligibility, but ultimately stated that she needed time to think about her options[5] (doc. 45-8, Bryson aff. ¶ 12; doc. 45-9, Shields aff. ¶ 18). The plaintiff admits that no one ever told her that she could not continue doing the teach-backs that were already scheduled (doc. 45-2, pl. dep. 172). She had more time to continue practicing teach-backs in accordance with the schedule Ms. Shields provided for June, and no one with the defendant told her anything to the contrary (id. at 165-66, 172-73). The plaintiff was "so devastated" after the June 10 teach-back that she left work and went to see her doctor (id. at 169-72).

The following day, June 11, 2013, Ms. Shields sent the plaintiff and Ms. Bryson an electronic calendar invitation for a development meeting the following week to discuss whether the plaintiff intended to continue practicing teach-backs in accordance with

---

[4] Ms. Shields states in her affidavit that she was also in this meeting with the plaintiff (doc. 45-9, Shields aff. ¶ 18), but the plaintiff does not remember Ms. Shields being present (doc. 45-2, pl. dep. 164).

[5] The plaintiff admits that she made no reference to an alleged medical condition in the course of the June 10, 2013, meeting, and she expressly denies ever mentioning the medication issue to Ms. Bryson (doc. 45-7, pl. resp. to RFA ¶ 27; doc. 45-2, pl. dep. 143-44).

the development plan or pursue other options  The plaintiff declined the calendar invitation and sent Ms. Shields an email stating "I will discuss alternatives when you return"[6] (doc. 45-2, pl. dep. 178-81; *see also* doc. 45-3, pl. dep., ex. 14).  Ms. Shields responded to the plaintiff's email, asking the plaintiff if by "alternatives" she meant additional options to practice teach-backs, including the ten already scheduled for the remainder of June (doc. 45-9, Shields aff. ¶ 20 & ex. B).  The plaintiff never responded to Ms. Shields' email regarding the meeting, and the plaintiff never attempted to further discuss her training or career options with Ms. Shields nor Ms. Bryson (doc. 45-2, pl. dep. 181-82; doc. 45-7, pl. resp. to RFA ¶ 32).

On June 11, 2013, the plaintiff visited Dr. Chastain and complained of lingering cognitive issues despite stopping her pain medication (doc. 45-2, pl. dep. 185-86). Dr. Chastain referred the plaintiff to a neurologist for testing (*id.*).  The next day, the plaintiff initiated a claim to Metlife to reinstate her prior long-term disability status on the basis that she was no longer able to work (*id.* at 189).  The plaintiff also submitted a claim for Social Security Disability Insurance ("SSDI") benefits – and was granted such benefits – based on her sworn representation that, as of June 12, 2013, she was unable to work as a result of her impairment (*see* doc. 45-10, ex. H).  The plaintiff returned to the Greenville Call Center that night and cleaned out her desk (doc. 45-2, pl. dep. 191).

On or about June 28, 2013, the plaintiff's neurologist, Dr. Pilch, performed an MRI, which confirmed that the plaintiff had suffered had suffered a series of "mini-strokes," and he told the plaintiff that her strokes likely contributed to her cognitive difficulties (*id.* at 186-87).  Based on that diagnosis, Dr. Pilch advised the plaintiff not to return to work (*id.* at 188-89).  Dr. Pilch ultimately advised the plaintiff that her condition was unlikely to improve, and she should remain out of work indefinitely (*id.*)

The plaintiff remained employed by the defendant, but continuously out of work, for the following six months; however, the plaintiff admitted that, given her medical

---

[6] Ms. Shields was scheduled to be on vacation the remainder of the week (doc. 45-9, Shields aff. ¶ 20).

status, she had no intention of ever returning to work for the defendant  (doc. 45-7, pl. resp. to RFA ¶ 33; doc. 45-2, pl. dep. 191-92).

On or about October 16, 2013, the plaintiff was informed that her claim for long-term disability had been denied (doc. 45-2, pl. dep. 194; doc. 45-7, pl. resp. to RFA ¶ 37).

At that point, the plaintiff had made no attempt to communicate with the defendant regarding her work status for several months (doc. 45-8, Bryson aff. ¶¶ 16-17). On November 25, 2013, the defendant sent the plaintiff a letter stating that, based on the denial of her long-term disability claim, she was expected to return to work by December 6, 2013 (doc. 45-2, pl. dep. 195; *see also* doc. 45-8, Bryson aff. ¶ 17 & ex. B).  The letter included forms for the plaintiff and her physicians to complete should she need any workplace accommodations, expressly including additional time away from work, and invited the plaintiff to call the defendant if she wished to further discuss accommodation issues (doc. 45-2, pl. dep. 195; doc. 45-8, Bryson aff. ¶ 17 & ex. B; doc. 45-7, pl. resp. to RFA ¶ 40).

The plaintiff never responded to the defendant's November 25, 2013, letter, nor did she return to work (doc. 45-8, Bryson aff. ¶ 18; doc. 45-2, pl. dep. 196-96).  On or about December 12, 2013, Ms. Bryson reached the plaintiff by phone to inquire about her work status.  The plaintiff informed Ms. Bryson that she did not need any medical accommodations for her employment because she was permanently unable to work and wished to retire from the defendant, effective immediately (doc. 45-2, pl. dep. 196-97; doc. 45-8, Bryson aff. ¶ 18; doc. 45-7, pl. resp. to RFA ¶ 41).

The plaintiff appealed the denial of her request for long-term disability benefits, based in part on her neurologist's assessment that she was permanently unable to return to work (doc. 45-2, pl. dep. 198-200).  In June 2014, the plaintiff's long-term disability benefits were reinstated, retroactive to January 29, 2013, the same day that the plaintiff initially returned to work for the defendant full-time following her 2012 surgery recovery (*id*.).  The plaintiff currently remains on long-term disability status, and she has not

12

sought other employment as a result of limitations from her condition (*id*.; doc. 45-7, pl. resp. to RFA ¶ 43).

On April 4, 2014, the plaintiff filed a charge of discrimination against the defendant, alleging that the defendant discriminated against her on the basis of a disability in June 2013 (*see* doc. 45-3, pl. dep., ex. 2).  Specifically, the plaintiff alleged:

> Due to complications from a medical procedure, I suffer from short term memory lapses and it takes me a bit longer to grasp training provided. Rather than provide me with the reasonable accommodation of an extended time to grasp the new training being provided, Verizon Wireless informed me that I should look into retiring or taking a demotion, despite the fact that there is not a specific policy in place requiring training to be completed within a specified time frame.

(*Id*.).  In her deposition, the plaintiff admitted that her charge of discrimination was limited to the defendant's alleged failure to accommodate her disability-related cognitive issues (doc. 45-2, pl. dep. 201-03).

On April 24, 2015, the plaintiff filed the instant complaint, alleging that the defendant discriminated against her on the basis of a disability in violation of the Americans with Disabilities Act ("ADA") (*see* doc. 1 at 3, comp.).  Specifically, the plaintiff alleges:

> I was out on FMLA beginning May 10, 2012. I returned to work on January 14th, 2013 after complications from a medical procedure. I was put on a six month performance evaluation period. On May 21, 2013, I discussed with Dr. Steven Chastain that I was experiencing problems with short term memory loss. He concluded that it was because of the medications he'd prescribed (see attachment). He advised "Stop taking the medications and the problem should resolve itself after the medications are out of your system." On May 22nd I explained my situation to the immediate supervisor, Tracie Shields and manager Jen Fischley. I was told by Ms. Fischley that my circumstance was not acceptable.
>
> Rather than provide me the reasonable time permitted by Verizon Wireless/Metlife disability guidelines, I was labeled as incompetent. Verizon Wireless informed me that I should retire or take a demotion.

(*Id*.).

13

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Under the ADA, an employer is prohibited from "discriminat[ing] against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a).  A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position the individual holds or desires." *Id.* §

14

12111(8).  Discrimination may include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ." *Id*. § 12112(b)(5)(A).  The relevant time for determining whether the plaintiff was "qualified" is the time in which the defendant allegedly denied the plaintiff her requested accommodation. *Stockton v. Shaw Indus. Grp., Inc.*, 2015 WL 427650, at *4 (D.S.C. Feb. 2, 2015) (citing *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 470 n. 3 (4th Cir. 2002)).  An employee cannot base a claim "solely on the allegation that the employer failed to engage in an interactive process." *Walter v. United Airlines, Inc.*, No. 99-2622, 2000 WL 1587489, at *5 (4th Cir. Oct.25, 2000) (citing *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir.2000)).  Instead, such an allegation is properly considered part of a failure to accommodate claim, and "the employee must demonstrate that the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the qualified employee." *Id*. (citing *Rehling*, 207 F.3d at 1016).

        "To establish a *prima facie* case for failure to accommodate, [the plaintiff] must show:  '(1)  that [she] was an individual who had a disability within the meaning of the statute;  (2)  that the employer had notice of [her] disability;  (3)  that with reasonable accommodation [she] could perform the essential functions of the position; and (4)  that the employer refused to make such accommodations.'" *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 579 (4th Cir. 2015) (quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir.2013) (brackets and ellipsis omitted)).  The undersigned finds that summary judgment should be granted because the plaintiff has failed to produce evidence upon which a reasonable fact finder could conclude that she meets the third and fourth elements of a *prima facie* case.

        The plaintiff does not dispute that teaching the New Hire Class was an essential job function of her Senior Trainer position (doc. 55 at 6, pl. resp. to m.s.j.; doc. 45-7, pl. resp. to RFA #3 (admitting that it was a "primary responsibility" but not the only primary responsibility)).  Instead, the plaintiff asserts that new hire training was not the only

15

essential function of her position, arguing that "recurrent" training of current (not "new hire") CSRs was also an essential function of her position (doc. 55 at 6-7, pl. resp. to m.s.j.). The defendant agrees that recurrent training is another essential job function (doc. 57 at 3, def. reply). As argued by the defendant, however, the plaintiff's alleged ability to perform one essential function of her job, training current CSRs, does not extinguish the requirement that she be able perform other essential functions, including new hire training, either with or without reasonable accommodation. The Certification Program required the plaintiff to successfully complete a teach-back so that she could demonstrate the ability to satisfy the essential function of teaching a New Hire Class with the new curriculum (doc. 45-2, pl. dep. 94-95). The plaintiff does not dispute that the cognitive difficulties she experienced in May-June 2013 precluded her from successfully completing the teach-back requirement (doc. 45-2, pl. dep. 102, 106-107, 126, 165-70, 191-92, 208-209). On June 10, 2013, the plaintiff realized that her cognitive issues left her unable to present the material in the manner required to act as a Senior Trainer, and she voluntarily left her position and sought medical attention for her difficulties (doc. 45-2, pl. dep. 168-73). Thus, it is undisputed that the plaintiff could not perform the essential functions of her position *without* reasonable accommodation, and the question becomes whether she could perform the essential functions *with* reasonable accommodation. *Stockton, Inc.*, 2015 WL 427650, at *3 (citing *Tyndall v. National Educ. Centers, Inc.,* 31 F.3d 209, 213 (4th Cir.1994)).

        In her response in opposition to the motion, the plaintiff argues that "[t]here was an accommodation available that would have been effective . . . she could have listen[ed] to customer calls, observe new hire class, give floor support, proxy welcome back, so many things" (doc. 55 at 14, pl. resp. to m.s.j.). However, *removal* of an essential job function is not an accommodation capable of making a disabled employee a "qualified individual." An individual who cannot perform an essential function of her job is "qualified" only if an accommodation will enable her to perform that essential function, because "[t]he ADA does not require an employer to reallocate essential job functions or assign an employee 'permanent light duty.'" *Howell v. Holland*, C.A. No. 4:13-cv-295-RBH, 2015 WL

16

751590, at *8 (D.S.C. Feb. 23, 2015) (quoting *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011)) (granting summary judgment on ADA claim because plaintiff admittedly could not work with his supervisor and did not dispute that working with his supervisor was an essential function of his position).

The evidence is undisputed that, in the meeting with Ms. Shields and Ms. Fischley on May 10, 2013, the plaintiff stated that her physician believed her cognitive issues were caused by pain medications, but the problems would subside once the medication left her system (doc. 45-2, pl. dep. 133-38; doc. 45-9, Shields aff. ¶ 16). The plaintiff contends that by telling Ms. Shields and Ms. Fischley that it would take time for the medication to leave her system, she was impliedly requesting additional time to complete the teach-backs required for her New Hire Class certification (doc. 45-2, pl. dep. 138-40). *See Wilson*, 717 F.3d at 346–47 ("The duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability."). The plaintiff further testified in her deposition that she was told by her doctor that it would take about 30 days for the medication to get out of her system, but she did not specifically ask Ms. Shields and Ms. Fischley for 30 days (*id.* at 139-41). To the extent that this is considered a request for the specific accommodation of additional time and training, the evidence shows that following the May 10th meeting, the plaintiff's development plan continued to be updated to provide for additional dedicated study time, training opportunities, and teach-backs scheduled through the end of June (doc. 45-3, pl. dep., ex. 11, 12, 13).[7] Further, the defendant continued to provide the plaintiff with immediate feedback and suggestions for improvement after each teach-back in an effort to help her

---

[7] The initial development plan was scheduled to culminate with a series of four teach-backs in late May and early June, 2013, each covering a different training module for the New Hire Class (doc. 45-2, pl. dep. 120-22; doc. 45-3, pl. dep., ex. 12). On June 5, 2013, an updated development plan was implemented in order to address the plaintiff's continued difficulty performing teach-backs (doc. 45-9, Shields aff. ¶ 17; doc. 45-8, Bryson aff. ¶ 11; doc. 45-2, pl. dep. 151-53). The new development plan added a series of 12 teach-backs scheduled throughout June (doc. 45-3, pl. dep., ex. 13).

improve (doc. 45-7, pl. resp. to RFA ¶ 23).  Following the plaintiff's last unsuccessful teach-back on June 10, Ms. Shields sent the plaintiff and Ms. Bryson an electronic calendar invitation for a development meeting the following week to discuss whether the plaintiff intended to continue practicing teach-backs in accordance with the development plan or pursue other options.  The plaintiff declined the calendar invitation and sent Ms. Shields an email stating "I will discuss alternatives when you return"[8] (doc. 45-2, pl. dep. 178-81; *see also* doc. 45-3, pl. dep., ex. 14).  Ms. Shields responded to the plaintiff's email, asking the plaintiff if by "alternatives" she meant additional options to practice teach-backs, including the ten already scheduled for the remainder of June (doc. 45-9, Shields aff. ¶ 20 & ex. B).  The plaintiff never responded to Ms. Shields' email regarding the meeting, and the plaintiff never attempted to further discuss her training or career options with Ms. Shields or Ms. Bryson (doc. 45-2, pl. dep. 181-82; doc. 45-7, pl. resp. to RFA ¶ 32).  The plaintiff admits that no one ever told her that she could not continue doing the teach-backs that were already scheduled (doc. 45-2, pl. dep. 172).  She had more time to continue practicing teach-backs in accordance with the schedule Ms. Shields provided for June, and no one with the defendant told her anything to the contrary (*id*. at 165-66, 172-73).  Despite this, the plaintiff voluntarily left her job on June 10th and did not return (*id.* at 188).

Based upon the foregoing, the defendant provided the plaintiff with the accommodation she says that she impliedly requested in the May 10th meeting.  While additional time to complete job requirements may in some cases be a "reasonable" accommodation, an employer is not required to wait indefinitely for an employee to meet the requirements of her position. *See Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) ("Nothing in the text of the reasonable accommodation provision requires an employer to wait an indefinite period for an accommodation to achieve its intended effect.").  In her response in opposition to the motion for summary judgment, the plaintiff argues that at the May 10th meeting she also requested "light duties until her medications were under control"

---

[8] Ms. Shields was scheduled to be on vacation the remainder of the week (doc. 45-9, Shields aff. ¶ 20).

(doc. 55 at 13-14, pl. resp. to m.s.j.). However, even if the defendant had provided the plaintiff with an indefinite time period for training and "permanent light duty"[9] by excusing her from conducting new hire training, the plaintiff admits in her deposition that her cognitive difficulties and ultimate stroke diagnosis precluded her from the ability to satisfy the requirements of her job (doc. 45-2, pl. dep. 213-16) as of June 28, 2013, when the plaintiff's neurologist performed an MRI that confirmed that the plaintiff had suffered a series of "mini-strokes" at some indeterminable time, which rendered her totally disabled and unable to work in any position, regardless of accommodation (doc. 45-2, pl. dep. 186-89, 213-16). The MRI and her doctor's diagnosis occurred during the time period in which the plaintiff still had pre-scheduled training available to assist her in completing the Certification Program (doc. 45-3, pl. dep., ex. 13, 14),

Furthermore, on June 12, 2013, prior to even receiving the stroke diagnosis, the plaintiff submitted a claim to Metlife to have her long-term disability status reinstated due to her inability to work (doc. 45-2, pl. dep. 189, 191, 198-200), and she also submitted a claim for SSDI benefits that was granted based on her claim that, as of June 12, 2013, she was unable to work as a result of her impairment (*see* doc. 45-10, ex. H). The plaintiff makes no attempt to explain the apparent contradiction in the disability representations she made in pursuit of these benefits and her contention in this case that she was a "qualified individual" capable of performing the essential functions of her job at the time the defendant allegedly denied her accommodation request. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (holding that while a claim for SSDI does not automatically bar an ADA claim, "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim" and a present assertion that she was a "qualified individual" entitled to an accommodation; "[r]ather, she must proffer a sufficient explanation" for the contradiction to survive summary judgment); *E.E.O.C. v. Greater*

---

[9] As noted above, "[t]he ADA does not require an employer to reallocate essential job functions or assign an employee 'permanent light duty.'" *Howell*, 2015 WL 751590, at *8 (D.S.C. Feb. 23, 2015) (quoting *Crabill*, 423 F. App'x at 323).

*Baltimore Med. Ctr., Inc*., 477 F. App'x 68, 76 (4th Cir. 2012) (affirming district court's grant of summary judgment to a former employer where the employee had been medically released for work after he secured SSDI benefits—a fact he never conveyed to the SSA—and where the employee testified that he believed he could have performed his essential duties without an accommodation); *Collins v. Network Exp., Inc*., C.A. No. 4:07-1564-RBH, 2008 WL 4280382, at *5 (D.S.C. Sept. 12, 2008) (granting summary judgment in part because "Plaintiff has not reconciled the inconsistency between claiming total disability for social security benefits purposes on the one hand, and pursuing an ADA claim on the other").

The plaintiff argues in response to the motion that summary judgment should be denied because "[i]t is a violation against the . . . [ADA] to test an employee with a mental impairment and base the outcome of the evaluations on whether he/she can maintain their position" (doc. 55 at 4, pl. resp. to m.s.j.). She claims that instead of accommodating her cognitive difficulties, the defendant "put her on a Performance Improvement Plan to test and evaluate her knowledge. She was mentally incapable of completing the tests (teach backs) until her medications were under control . . . " (*id.* at 14). The plaintiff admits that, in the course of the Certification Program, each trainer was evaluated as either "ready" or "not ready" to train new hires and that, according to the "Trainer Readiness Criteria" used to evaluate a trainer's "ready" status, a trainer who received a "not ready" evaluation would be required to work with his or her supervisor to prepare a development plan designed to get the trainer "ready" to teach new hires (doc. 45-2, pl. dep. 85-87; doc. 45-3, pl. dep., ex. 8). As the plaintiff testified in her deposition, "[W]hen you're not ready, you go into that development stage. So, yes, that's expected" (doc. 45-2, pl. dep. 106). The evidence shows that the plaintiff's development plan or performance improvement plan was initiated several weeks prior to the May 10th meeting, after the plaintiff received "not ready" status following the teach-back at the workshop on April 18, 2013 (doc. 45-2, pl. dep. 109-110; doc. 45-4, Shields dep. 37; doc. 45-3, pl. dep. ex. 11-12; doc. 55-15). The plaintiff herself submitted as an exhibit a copy of an email from

20

Ms. Shields to Ms. Fischley and Ms. Bryson, dated May 1, 2013, in which Ms. Shields noted that she was sending a copy of the development plan that she had "been working on" with the plaintiff (doc. 55-15). Accordingly, the plaintiff's claim that she was placed on the plan only after she mentioned that her cognitive difficulties were related to her medications on May 10th is undermined by the undisputed evidence. Moreover, there is no evidence that the focus of the plaintiff's development plan changed after May 10th; rather, the evidence shows that the defendant consistently required the plaintiff to practice new hire training modules until she could successfully complete the Certification Program, which she admittedly was never able to do (doc. 45-3, pl. dep. 11, 12).

Based upon the foregoing, the plaintiff has not satisfied the third and fourth elements of a *prima facie* case as she has not shown that she was a qualified individual under the ADA such that had she been given a reasonable accommodation, she could have "performed the essential functions of the employment position," nor has she shown that the defendant refused to make such accommodations. Accordingly, summary judgment should be granted on the plaintiff's ADA failure to accommodate claim.

In her response in opposition to the motion, the plaintiff describes the written feedback (from Training Department colleagues) after some of her failed teach-backs as being "brutal," leaving her "humiliated and embarrassed" (doc. 55 at 11, 16, pl. resp. to m.s.j.). She further claims that the "environment was filled with hostility," and the defendant's "intentional and reckless behavior was severe enough to create a work environment that was intimidating, hostile, and abusive" (*id.* at 4, 16). To the extent these allegations could be construed as an attempt to plead a claim for disability-related "harassment," the plaintiff did not plead harassment allegations in her charge of discrimination nor in her complaint (docs. 1, 45-3), and thus any harassment claim is procedurally barred. *See Evans v. Tech. Apps. & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996) (affirming summary judgment on harassment claim not raised in the charge of discrimination because "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original charge, and those developed by reasonable investigation

21

of the original charge" may be raised in a subsequent lawsuit); *Wells v. BAE Sys. Norfolk Ship Repair*, 483 F.Supp.2d 497, 511 (E.D. Va. 2007) (dismissing ADA hostile work environment claim because the plaintiff did not make such an allegation in her EEOC charge).

Furthermore, even if the claim was allowed to proceed, it fails as a matter of law. In order to establish such a claim for discrimination based upon a work environment that is hostile to one's disability, the plaintiff must prove that "(1) [s]he is a qualified individual with a disability; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on h[er] disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer." *Fox v. General Motors Corp.*, 247 F.3d 169, 177 (4th cir. 2001). The plaintiff has failed to produce evidence that the feedback she received from colleagues was based on her disability. The plaintiff's own testimony is that she only told Ms. Shields and Ms. Fischley about her condition. Furthermore, a colleague's use of the term "trainwreck" or a "frowny face" image to describe certain aspects of the plaintiff's teach-back performance (doc. 55 at 16, pl. resp. to m.s.j.) is not sufficiently severe or pervasive harassment based on her disability, particularly considering that those isolated criticisms were included within pages of constructive commentary, both positive and negative (*see* doc. 55-12).

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the defendant's motion for summary judgment (doc. 45) should be granted.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 24, 2016
Greenville, South Carolina

22

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).